[Crim. No. 10657. Second Dist., Div. Two. Jan. 26, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. PATRICIA ELIZABETH DALE, Defendant and Appellant.

Peter D. Bogart, for Defendant and Appellant.

Bodle & Fogel, George E. Bodle, Daniel Fogel, Stephen Reinhardt and Loren R. Rothschild as Amici Curiae on behalf of Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Appellant was charged with grand theft in two counts of an information which alleges that during the two different periods of time specified therein, appellant "did willfully, unlawfully and feloniously take money of an amount in excess of two hundred and 00/100 Dollars ($200.00), lawful money of the United States, the personal property of State of California Department of Employment, . . ."

Appearing with counsel, appellant in due form entered her plea of guilty to both counts, and on October 14, 1964, a judgment of conviction was entered thereon sentencing her to prison for the term prescribed by law. On October 20, 1964, appellant appeared by substituted counsel and moved to vacate the judgment of conviction, to withdraw her plea of guilty, and for leave to substitute a plea of guilty to a charge of violating section 2101 of the Unemployment Insurance Code.

While admitting that she stole in excess of $6,000 of state funds, appellant nevertheless urged her basic contention that the trial court was without jurisdiction to try her on any charge other than that of violating section 2101 of the Unemployment Code which declares that "It is a misdemeanor to wilfully make a false statement or representation or knowingly fail to disclose a material fact to obtain . . . any benefit or payment under the provisions of this division. . . ."

On October 22, 1964, the trial court heard and denied appellant's motion. On the same date appellant filed her notice of appeal from "the judgment and conviction and sentence imposed upon her, and from the denial of applications and motions made after judgment, and from each and every part thereof, on questions of law and fact."

It is elementary, of course, that a judgment entered on a plea of guilty is not appealable on the merits. (*People* v. *Mullane,* 182 Cal.App.2d 765, 768 [6 Cal.Rptr. 341].) Ordinarily, a defect of the variety here alleged may not be reached by any motion made after judgment. As stated in *People* v. *Banks,* 53 Cal.2d 370, 378-379 [1 Cal. Rptr. 669, 348 P.2d 102] :

''Except where the asserted defect is jurisdictional or constitutional [citation], a situation not presented here, the limited purpose of the nonstatutory motion to vacate a judgment of conviction, or the California version of the writ of error *coram nobis,* is 'to secure relief, where no other remedy exists, from a judgment rendered while there existed some fact which would have prevented its rendition if the trial court had known it and which, through no negligence or fault of the defendant, was not then known to the court.' [Citation.] The remedy does not lie to enable the court to correct errors of law. [Citation.]

''It has often been held that the motion or writ is not available where a defendant voluntarily and with knowledge of the facts pleaded guilty or admitted alleged prior convictions because of ignorance or mistake as to the legal effect of those facts. [Citations.] Furthermore, it has been held, 'appellant's contention that his plea of guilty should be set aside on the basis of mistake, ignorance, [and] inadvertence . . . is unavailing because the record discloses that he was represented by counsel at all stages of the proceedings.' [Citation.]

''In the cases cited in the preceding paragraph, if the defendant because of his or his counsel's mistake of law pleaded guilty or admitted a charged prior conviction without presenting the facts to the trial court, the situation comes within the rule stated in the *Adamson* case, *supra,* p. 326 [1] of 34 Cal.2d [210 P.2d 13], i.e., the remedy is not available because it was through defendant's 'negligence or fault' that the facts were not known to the court; if the facts were known to the court yet it accepted defendant's plea or admission, the situation comes within the rule stated in the *Tuthill* case, *supra,* page 822 [3] of 32 Cal.2d [198 P.2d 505], i.e., the remedy is not available because it is sought to enable the court to correct a mistake of law.

''When the trial court in the present case (San Diego County) accepted defendant's admission that he had been

convicted of a felony and his plea of guilty to the charge of a crime which has such prior conviction as an essential concurring element, the court did not know the facts as to defendant's Alameda County plea and probation. Defendant and his then counsel, however, knew or were chargeable with having known those facts, and the failure to present the contention that defendant had not been convicted of a felony and the facts upon which such contention is based was due to defendant's 'negligence or fault.' ''

Moreover, in the instant case, appellant failed to file any affidavit of her own in support of her motion. The only affidavit received was one prepared by her counsel in which he alleged: ''I have carefully examined the record of the proceedings herein and the probation report, and have investigated the case at bar and similar cases. . . . The alleged crime was committed by means of trick and device and/or false pretense, namely by the use of false and fictitious claims to obtain unemployment insurance funds. . . . Defendant is desirous of correcting the court records, and has advised me that she desires to plead guilty to the proper charge, i.e. violation of Unemployment Code § 2101. That such a plea was her intent, but that she was confused by the court proceedings and not fully advised by counsel as to the implications of her plea.''

Mere allegations of ultimate facts or conclusions by counsel, based in part upon alleged hearsay communications purportedly received from his client, are ordinarily insufficient to support any motion. (Cf. *People* v. *Evans*, 185 Cal.App.2d 331, 333-334 [8 Cal.Rptr. 410]; *Nini* v. *Culberg*, 183 Cal.App.2d 657, 664 [7 Cal.Rptr. 146].) This would appear particularly true in a case such as the instant one where the plea of guilty was originally entered in the municipal court and therefore not even a transcript of the preliminary hearing was before the trial court for its consideration in ascertaining the factual basis for the charges filed against appellant.

Nevertheless, we have considered appellant's basic contentions on their merits. Her contention that the superior court lacked jurisdiction to consider the cause is mistaken since she was charged with a felony in a complaint sufficient upon its face. The mere fact that if a trial had been sought and the evidence produced therein had demonstrated that appellant was guilty only of a misdemeanor, whether or not it was necessarily included within the crime alleged, such

fact would not serve, ex post facto, to deprive the court of its jurisdiction over the accused and the subject matter of the accusation.

 Appellant's contention that the accusatory pleading was insufficient in that a state agency cannot be the victim of the crime of theft is without merit. (*People* v. *Diamondstein,* 42 Cal.App. 490, 491 [183 P. 679]. Cf. also, *People* v. *Finston,* 214 Cal.App.2d 54, 61 [29 Cal.Rptr. 165]; *People* v. *Olf,* 195 Cal.App.2d 97, 107 [15 Cal.Rptr. 390].)

 Appellant argues that the state is estopped to prosecute her for any offense more serious than a misdemeanor because various forms used by the Department of Employment warned that the making of false statements would be punishable as a misdemeanor. The contention is wholly devoid of merit. In effect, such claim amounts to the patently absurd assertion that the state *induced* her to devise a complex scheme whereby she succeeded in stealing some $6,000 by its promises, on which she reasonably relied, that even if apprehended she would be subject to no more than the maximum punishment prescribed for misdemeanants. Such a contention is pregnant with its own refutation.

 Appellant's contention that the enactment of Unemployment Insurance Code section 2101 effects a *pro tanto* repeal of the provisions of the Penal Code as to theft is likewise unmeritorious. It is true that the decision in *People* v. *Haydon,* 106 Cal.App.2d 105 [234 P.2d 720], relied on by appellant, held that said section effected a *pro tanto* repeal of section 72 of the Penal Code dealing with the filing of false claims with any state board. However, the *Haydon* case cited with approval the case of *People* v. *Armstrong,* 100 Cal.App. 2d Supp. 852 [224 P.2d 490], in which a conviction for theft was sustained under similar facts.

Our conclusion regarding the relationship between section 2101 of the Unemployment Insurance Code and the Penal Code provisions as to theft finds support in the reasoning of *People* v. *Ryerson,* 199 Cal.App.2d 646 [19 Cal.Rptr. 22], wherein the defendants were charged with obtaining money by false pretenses from the County Welfare Department in violation of section 484 of the Penal Code. The court stated at page 650:

"In the present case the provisions of the Welfare and Institutions Code and the Penal Code are no more antagonistic than were the provisions of the Education Code and the

Government Code in *People* v. *Darby*, 114 Cal.App.2d 412 [250 P.2d 743]. There the court held that the laws of this state have been codified and 'All of them combined speak for the sovereign power and all constitute but a single statute.' (P. 422.) Again, quoting from the *Darby* case, here, as there, 'The two codes are not antagonistic laws, but both are parts of the state's jurisprudence and must be harmonized and effect given to every section.' (P. 424.) Thus, the mere fact that the Legislature has included provisions within the Welfare and Institutions Code which refer to prosecution for particular crimes (in this case, perjury) does not of itself indicate a legislative intent that prosecutions for other crimes provided for in the Penal Code must be precluded.''

Our rejection of appellant's contentions in the foregoing discussion suffices also to dispose of appellant's contention regarding the inadequacy of her representation by her former counsel, since it is founded entirely upon her theory that she could not properly be charged with the crime of theft to which she had entered her plea of guilty. We also have considered appellant's arguments that by reason of the confidential nature of information supplied to the Department of Employment and the fact that unemployment insurance is a national plan, the present prosecution is prohibited. We deem such contentions so clearly unsubstantial and unmeritorious as to require no detailed discussion.

The judgment and the order presented for review are affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied February 23, 1966, and appellant's petition for a hearing by the Supreme Court was denied March 30, 1966.

[Civ. No. 30048. Second Dist., Div. Three. Jan. 26, 1966.]

LISA CATALANO, Petitioner, v. THE SUPERIOR COURT
OF LOS ANGELES COUNTY, Respondent; MICHAEL
L. CATALANO, Real Party in Interest.

Robert L. Brock and Edwin S. Saul for Petitioner.

No appearance for Respondent.

Fetterly & Fetterly and Carl T. Fetterly for Real Party in
Interest.

FRAMPTON, J. pro tem.*—Petition for mandate to compel a hearing on a motion for attorney's fees, alimony and

*Retired judge of the superior court sitting under assignment by the
Chairman of the Judicial Council.

child support pending an appeal from an interlocutory decree of divorce.

Petitioner is the defendant and cross-complainant in an action for divorce filed against her in the respondent court by her husband, Michael L. Catalano, the real party in interest here. The petition alleges that the husband's complaint contained what purported to be a property settlement agreement executed by the parties disposing of the community property and wherein petitioner had waived her right to ask for attorney's fees and alimony in the event that an action for divorce was filed. Petitioner filed an amended cross-complaint wherein she asked for a divorce, custody of the three minor children, issue of the marriage, for an equitable division of the community property, alimony, child support and reasonable attorney's fees. She also sought to set aside the property settlement agreement upon the ground that it had been obtained by means of fraud practiced upon her by her husband and upon the further ground that she had signed the document while under duress. The divorce action was tried and on June 9, 1965, an interlocutory decree was entered granting the divorce to both plaintiff and defendant therein. The court found against the defendant on her allegations of fraud and duress, found the property settlement to be fair and equitable and approved it. The court awarded the custody of the three minor children to the defendant with visitation rights, subject to certain restrictions, to the plaintiff, and ordered the plaintiff to pay $65 per month for the support of each minor child and, in addition, to pay their reasonable medical and dental bills. The decree denied the petitioner's plea for alimony, attorney's fees and costs, the court holding that she had waived them under the provisions of the property settlement agreement.

Petitioner filed timely notice of appeal from the interlocutory decree, and on August 25, 1965, filed a notice of motion for an order granting alimony, increased child support, and attorney's fees and costs pending the outcome of the appeal, which motion came on for hearing on September 15, 1965. At this time, the petitioner abandoned that portion of her motion relating to increased child support, on the ground that no showing could be made of a change of circumstances since the entry of the interlocutory decree. Because of the amount of time necessary to hear the motion and the congested condition of the court's calendar the hearing was continued over to October 19, 1965. On the latter date the motion

came on for hearing at which time the trial judge denied the motion without a hearing.

"During the pendency of any action . . . for divorce . . . the court may order the husband . . . to pay such amount as may be reasonably necessary for the cost of maintaining or defending the action and for attorney's fees if such relief is requested in the complaint, cross-complaint or answer; and from time to time and before entry of judgment, the court may augment or modify the original award, if any, for costs and attorney's fees as may be reasonably necessary for the prosecution or defense of the action or any proceeding relating thereto. In respect to services rendered or costs incurred after the entry of judgment, the court may award such costs and attorney's fees as may be reasonably necessary to maintain or defend any subsequent proceeding therein, whether or not such relief was requested in the complaint, cross-complaint or answer, and may thereafter augment or modify any award so made." (Civ. Code, § 137.3.) An action is deemed to be pending from the time of its commencement until the time for appeal has passed, unless the judgment is sooner satisfied. (Code Civ. Proc., § 1049.)

It has been held that temporary alimony, child support, and suit money may be awarded the wife in an independent action in equity brought by her to set aside parts of an interlocutory decree of divorce granted to the husband and which incorporated a property settlement dividing their property and providing for child support and monthly payments in lieu of alimony. (*See* v. *Superior Court,* 55 Cal.2d 279 [10 Cal.Rptr. 634, 359 P.2d 32].) It has also been held that the wife may be entitled to suit money in the prosecution of a motion under the provisions of section 473 of the Code of Civil Procedure to set aside a judgment of divorce. (*Grannis* v. *Superior Court,* 143 Cal. 630 [77 P. 647]; *Nelson* v. *Nelson,* 7 Cal.2d 449 [60 P.2d 982].) ▮ The trial court does not lose jurisdiction, after the rendition of the interlocutory decree, to enter an order, upon a proper showing, requiring the husband to pay any money necessary to enable the wife to prosecute her action on appeal from such decree. The power to make an allowance to the wife for her support or to enable her to defend or prosecute the action is not exhausted upon the rendition of the judgment in the trial court, but continues during the pendency of the appeal. (*Bruce* v. *Bruce,* 160 Cal. 28, 30 [116 P. 66]; *Kyne* v. *Kyne,* 74 Cal.App.2d 563, 568-569 [169 P.2d 272]; *Heilman* v. *Heilman,* 122 Cal.App.2d 771, 776-777 [266 P.2d 148].)

Here, the wife, by having filed a timely notice of appeal from the interlocutory decree, has instituted a direct attack upon a judgment which sustained the validity of a property settlement agreement wherein she had waived alimony and suit money and which she had sought to set aside as having been obtained through fraud and duress. The action, though on appeal, is still pending. Under these circumstances, the wife is entitled to be heard on her motion for alimony and suit money pending the outcome of the appeal, and the trial court acted in excess of its jurisdiction in denying her motion without a hearing.

Let the peremptory writ of mandate issue.

Ford, J., and Kaus, J., concurred.

[Crim. No. 11200. Second Dist., Div. Four. Jan. 26, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD TOVAR, Defendant and Appellant.

Elinor Chandler Duncan for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Raymond Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged, in two counts, with possession of marijuana (Health & Saf. Code, § 11530), and sale of marijuana (Health & Saf. Code, § 11531). A motion to dismiss, under section 995 of the Penal Code was made and denied. Defendant pled not guilty and, after a trial to the court (jury trial having been duly waived) he was found guilty; a motion for new trial was made and denied; probation was denied; and defendant was ordered committed to the Youth Authority. He has appealed.

The police were engaged in investigating sales of narcotics at and near Belmont High School, in the City of Los Angeles. They had arranged with the vice principal of the school, Mr. Condit, that Officer Tawes would act as an undercover operative, seeking to identify peddlers; that Officer Tawes would give to Mr. Condit any information thus secured and that Mr. Condit would relay that information to Sergeant Zappey. During the course of this investigation, Officer Tawes had several transactions with a student named Darrell Mitchell, in the course of which Mitchell sold Tawes marijuana cigarettes, and, in conversations, told the officer that his source of supply was a fat Mexican named Tovar,

who employed Mitchell to sell marijuana to students for a commission.

On the morning of November 17, 1964, Mitchell approached Tawes with an offer to sell more marijuana. Tawes arranged to meet Mitchell and make the purchase after school that afternoon. Tawes notified Condit of this arrangement and Condit passed the information along to Sergeant Zappey. On orders from the latter, other officers came to the school and arrested Mitchell, who was found to be in possession of a quantity of marijuana. Under interrogation,[1] Mitchell told the officers that he had obtained the marijuana from Tovar, pointed out the place where Mitchell believed Tovar lived, and told them that Tovar usually caught a morning bus at the intersection of Beverly Boulevard and Park View. At 7:45 a.m. the next morning the officers arrested Tovar at this intersection, took him to the police station, where a search of his person disclosed him to be in possession of a plastic sack containing marijuana cigarettes.

Defendant contends that his conviction was based on evidence illegally obtained, urging that both the arrest of Mitchell and that of Tovar were made without reasonable cause.

## I

The arrest of Mitchell was entirely lawful. The arresting officers acted on information received by them from fellow officers, the foundation of which was the personal information of Officer Tawes as to his prior dealings with Mitchell and Mitchell's statements made to the officer on the morning of the arrest. Defendant contends that the official chain was broken because the data from Officer Tawes passed through Mr. Condit on its way to Sergeant Zappey. But Mr. Condit was a known and reliable person, holding an official status of respect and responsibility. The reasonableness of Mitchell's arrest and the propriety of using information thereby secured is obvious.

## II

But the arrest of Tovar stands on a different basis. The only information tending to connect Tovar with the sales at Belmont was the information given the officers by Mitchell—an informant whose reliability was untested and who had given that information under circumstances not overly

---

[1] It is not here questioned that Mitchell was properly warned of his constitutional rights after his arrest and before the interrogation of him began.

conducive to credibility. The Attorney General argues that the officers had other, and independent, information that Tovar was engaged in the narcotic traffic. However, under examination, the officers involved could point to only one specific basis for such suspicion—a juvenile court petition filed and thereafter dismissed. Otherwise, the officers had only "conversations" with other officers who had said that "Tovar was involved in narcotics." We do not regard this as aiding in the search for probable cause. No officer, anywhere along the unidentified chain of communication, was said to have known, of his own knowledge, that Tovar had been discovered in any involvement with narcotics, except for one instance referred to. No record of conviction was shown, no arrest records were produced, and we are left with a mere suspicion, by officers not identified in this record, based as far as we are told[2] on pure hearsay from unofficial and untested sources.

■ It is true that information from a nonreliable source may be buttressed by an accumulation of other independent data; and that reliability may be shown by the fact that information from the nonreliable source has been verified by independent investigation. ■ But, in addition to Mitchell's own identification of Tovar as his source of supply, Mitchell had told only that he *thought* Tovar lived at a certain address—a fact not verified—and that he usually took a bus at a certain intersection. Only the latter bit of data was verified. We do not feel that this single bit of data, as to conduct not prima facie incriminating, was enough to cause a reasonable man to regard Mitchell's self-serving statements as tested to a point justifying a warrantless arrest and search.

The case before us bears a striking similarity to the situation in *People* v. *Amos* (1960) 181 Cal.App.2d 506 [5 Cal. Rptr. 451]. There, as here, the police arrested an alleged supplier of narcotics on the basis of information given to them by an addict, under arrest, but not shown to be a "reliable" informant. There, as here, it was claimed that the informant's credibility was shown by the fact that defendant

---

[2]Since the arrests were without a warrant, the burden was on the People to show the existence of reasonable cause (*People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927]); we must decide the case on the record made in the court below. We recognize the possibility that the official suspicions of Tovar may have been, in fact, based on more reliable data than was here presented; if this is so, the People will have an opportunity, if the case is retried, to supplement their proof.

was discovered leaving the premises where the informant had said he would be. The court said (at p. 508) : "Information such as here provided simply serves to point the finger of suspicion at a particular person and ordinarily results in surveillance or investigation of the suspect. If the investigation or observation of the suspect tends to confirm the report of the informant whose reliability has not been established a lawful search or arrest may be made provided the combined information gives reasonable cause therefor. [Citation.] But in the instant case the officers observed no act or conduct on the part of the defendant that tended to indicate he was violating the law.''

### III

It is true that Mitchell's testimony against defendant, given in court, was, by itself, if believed by the trial court, sufficient to sustain a conviction of sale (either by defendant to Mitchell, or by defendant to Tawes through Mitchell as defendant's agent), or of possession incident to such a sale. But Mitchell's testimony supports only a finding of possession in connection with the sales in which Mitchell was involved; only the unlawful search of Tovar, after his unlawful arrest, provided evidence of a possession on the morning of November 18th, as charged in Count I. And we cannot say that, without the partial verification of Mitchell's story which Tovar's arrest and the subsequent search provided, a finding of guilt of either possession or of sale on the earlier occasions would have been made. It follows that the conviction on both counts must be reversed.

The judgment is reversed.

Files, P. J., and Jefferson, J., concurred.

[Civ. No. 10961. Third Dist. Jan. 26, 1966.]

DONALD A. MART, Plaintiff and Respondent, v. CHARLES W. RILEY, SR., et al., Defendants and Appellants.

Healy & Robinson, Newton & Braun, Rodrick L. Robinson and William J. Braun for Defendants and Appellants.

Randall J. Presleigh, Kiernan & Misciagna, Carlton & Asbill, Daniel S. Carlton and N. A. Misciagna for Plaintiff and Respondent.

VAN DYKE, J.*—This appeal is from a judgment entered on a verdict awarding damages to plaintiff Donald A. Mart for personal injuries alleged to have been suffered by him through the negligence of defendants-appellants. Plaintiff-respondent was a laborer employed by M. W. Brown, a highway contractor, then engaged in building a county road in southwestern Shasta County. The work required that a seal coat of oil be applied to the road surface, after which sand was to be spread over the oil. For the performance of this work appellants rented to Brown a dump truck and furnished a driver for its operation. When the truck arrived at the site of the work, Brown attached a gasoline-driven sand spreader to the tailgate of the truck. As a means of getting the sand into the spreader Brown cut a hole about a foot square in the

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

tailgate. Brown's plan of operation contemplated that sand would move through the hole into the hopper of the spreader; and to facilitate and regulate the supply of sand one or two men with hand shovels would work in the truck near the tailgate, shoveling sand through the hole. There was much evidence that this was a common and accepted method of doing the work. The operation also involved driving the truck slowly backward along the oiled surface to prevent the wheels from running over unsanded oil. The truck was first loaded with about 14 tons of sand. Respondent and a laborer named Castillo were assigned by Brown's foreman to work with the driver. There was evidence of the following facts: When sanding began Castillo was stationed in the bed of the truck which had been tilted at a slight angle to facilitate the movement of sand. Respondent and foreman Gage were on the ground moving alongside the truck. After about 300 yards of sanding, Castillo was unable to keep the spreader supplied and the foreman ordered respondent to get into the truck bed to help. To enable him to do this, the truck stopped and started up again when he had taken his position on the truck. The truck started with a jerk, the truck bed rose suddenly to an angle of about 45 degrees. The load of sand shifted toward the tailgate which failed to hold and respondent and the load of sand avalanched down onto the roadway. As he went down respondent came in contact with the revolving blade of the spreader. He suffered serious injuries.

The foregoing history of the accident was that of several eyewitnesses. The driver's version was much in conflict therewith. He said that when he was sent to the job by appellants with his truck, he did not know a spreader was to be attached and had never used one. But when told by Brown this was to be done and that Brown had so arranged with appellants he made no objection. When the spreader had been attached and his truck loaded he proceeded to back along the road with the truck bed tilted to cause sand to flow toward the hopper. He said he did not know that either respondent or Castillo were to be working in the truck shoveling sand and would not have allowed it if he had known; that he never saw them there. He denied any jerking of the truck, denied any sharp tilting. He gave no explanation of why the sand swept down, tore out the tailgate and deposited the sand and respondent on the road. He did say that as the truck approached an intersection that had already been sanded Gage, Brown's foreman, who had been running along ahead of the truck to direct him as to speed, yelled at him to speedup to prevent double sanding of

the intersection; that he speeded up across the intersection, then took his foot off the accelerator, the truck lurched and he saw the sand hit the road.

It appears from the evidence that it was the sudden jerk or lurch of the truck and, as some testified, the sudden sharp elevation of the bed of the truck, together with the failure of the tailgate to hold, which caused respondent's injuries. Whether one, or the two in combination, is not material here because both are chargeable to appellants as being caused either by negligent driving or defective condition of the truck, or by both. Under the circumstances the rule res ipsa applies.

Respondent received workmen's compensation benefits from the insurance carrier for Brown and brought this action against appellants as third party tortfeasors responsible for his injuries. Brown's insurance carrier intervened.

Errors asserted on appeal revolve around instructions given, refused or modified and error in the receipt of evidence.

A pivotal question here is who, at the very time of the accident and in respect to the driving and operation of the truck, was the employer of the truck driver? As to this, we think there can be no dispute. Appellants Riley were the general employers of the truck driver at all times. "[W]hen a master hires out, under a rental agreement, the services of an employee for the operation of an instrumentality owned by the master, together with the use of the instrumentality, without relinquishing to the hirer the power to discharge such servant, to go where and perform such work as the hirer directs, the legal presumption is that, although the hirer directs the servant where to go and what to do in the performance of the work, the servant, as the operator of the instrumentality employed in the doing of the work, remains, in the absence of an agreement to the contrary, the servant of the general employer insofar as concerns a manner and method of operating the instrumentality. . . ." (*Billig* v. *Southern Pac. Co.*, 189 Cal. 477, 485-486 [209 P. 241].)

A case similar to this one factually is *McComes* v. *Al. G. Barnes Shows Co.*, 215 Cal. 685 [12 P.2d 630], where the defendant hired out an elephant and trainer to a movie studio. The trainer was negligent in securing a howdah on top of the elephant and as a result an actress was injured. The court said at page 691: ". . . If the uncontradicted evidence shows as a matter of law that Nance [the elephant trainer] was then in the employ of his general employer, the appellant, and that his special employer, the Wm. Fox Studio, had no

direction or control over him in respect to the particular services out of which the accident arose, then the question as to liability for his negligence was not one for the jury.''

The physical facts of the accident here speak clearly as to the cause of respondent's injuries. It was the sudden tilting of the truck bed, aided, perhaps, by the jerking of the truck. Without the sudden tilting of the truck bed the accident could not have happened. The sand was somewhat damp and did not flow readily. The truck had been moving with the bed tilted slightly, estimated at about 5 degrees, which would facilitate the motion of the sand toward the tailgate. But unless the truck bed had been tilted to a high degree the sand could not have avalanched down against the tailgate and, having broken it open, swept down onto the road bearing respondent with it. Proper control of this tilting was the duty and function of the driver. The driver was shown, without conflict, to have been an experienced driver of dump trucks, and the evidence is without conflict that he went along with the truck under the rental contract as the employee of appellants, charged with the duty of operating the truck. He was operating the truck at the instant of the accident. It is true that as the truck moved backward over the oiled road surface Brown's foreman, going along beside the truck, gave signals to the driver as to the speed the truck was to proceed and as to increased tilting of the truck bed, nevertheless, these things did not work a change of employers. As said in *Doty v. Lacey*, 114 Cal.App.2d 73, 79-80 [249 P.2d 550] : ''. . . The giving of signals . . . was not the giving of orders, but of information; and obedience of the signals shows cooperation rather than subordination, and is not sufficient to show there has been a change of employer. . . .'' We think it clear from the record that throughout the sanding operation the truck driver was the employee of appellants as to the operation of the truck; that nothing done by Brown made him the driver's special employer at any time. In this connection we note that there is no evidence that the making of the hole in the tailgate weakened, or could have weakened, that structure and caused or contributed to its being torn out under the impact of the sliding sand.

Appellants complain of the giving of the following instruction at the request of respondent: ''Under the law of California an employer is charged with the negligence of his employee committed in the course and scope of his employment. Here the defendant, Knudson [the truck driver], was

the employee of Riley Brothers and was acting within the course and scope of his employment at the time of the accident in question. Thus if under all the instructions of the court you find that Knudson was guilty of negligence proximately contributing to the injuries of Donald Mart, such negligence is charged against the defendants, Riley Brothers.'' Under the facts of this case, as we have pointed out, this was a proper instruction. That the truck driver was the employee of appellants at the time of the accident and in the doing of that which caused the injury was not a jury question.

■ Appellants complain also of the giving of the following instruction requested by appellants and given by the court as modified: ''If you believe that Knudson was directed by his original employer to render service under the control of Brown and that Brown was authorized to and did exercise authoritative control of the methods and details of the work, Brown thereby becomes a special employer. If Knudson thereafter is negligent such negligence is imputed to Brown as special employer.'' This instruction had no application to the facts. The evidence would not have supported a finding by the jury that Brown became the special employer of the truck driver. The instruction should not have been given. But it was more favorable to appellants than their rights required, and we fail to see where it could have caused any damage to them. The error was harmless.

■ Appellants allege error in the giving of the following instruction at the request of respondent: ''In this case the defendants had the duty to exercise ordinary care in the sand spreading operation of the truck being operated by the defendants. This duty extended in favor of Donald Mart, one of the persons on the job. If the defendants failed to perform this duty and as a proximate result thereof such plaintiff suffered injury, the defendants are guilty of negligence.'' This instruction correctly stated the law as applied to the facts of the case. Concerning it appellants say: ''This instruction . . . states, as a matter of law, that Riley was in charge of the sand spreading operation. . . .'' But the instruction does not say that. It says appellants were in charge of the ''sand spreading operation of the truck.'' And they were. They further state: ''The jury, as a matter of fact, could have found that Riley was not in charge of any sanding or sand spreading operation and was in fact not negligent in relation to any activity at the scene of the accident.'' And that: ''At the moment of the instant accident, Knudson [the truck

driver] was acting exclusively under orders of Brown in committing the unlawful . . . and negligent act that precipitated the accident. . . ." What we have already said disposes of these contentions.

■ Appellants allege error in that the court refused to give two instructions proffered by appellants and having to do with intervening causes. These instructions were properly refused. Under the evidence any negligence of Brown would not have insulated appellants from liability for their own neglect. Brown, as the employer of respondent, was charged with the duty of furnishing him a safe place to work and with refraining from sending him to work in an unsafe place. There was evidence that the fastenings of the tailgate were defective, that these defects were discernible, that they were known to appellants, through their upkeep men, when they sent the truck to the job, and that had the fastenings been properly maintained the tailgate would not have broken. The negligence of Brown, if any, in this aspect of the case was in his not having inspected and corrected the fastenings, or not having them corrected before stationing respondent on the truck bed.

The requested instructions were taken from BAJI No. 104-C and No. 104-C-1.

. ". . . An intervening cause is one which comes into active operation in producing the result *after* the negligence of the defendant. [Citing Rest., Torts, § 441.] 'Intervening' is used in a time sense; it refers to later events." (Prosser, Torts (3d ed. 1964) pp. 309-310.)

Under the facts here any negligence of Brown in re the condition of the tailgate could not have been an intervening cause efficient to insulate appellants from liability for their negligence in having furnished a defective truck. For that defect, an insecure tailgate, could not have caused or contributed to respondent's injuries without the negligence of the driver in operating the truck. As the trial court said in noting its reasons for refusal: "Alleged negligence of Riley, Brown, not sequential in time, in view of Knudson's control to time of injury." The instruction was properly refused.

Appellants charge that since Brown was the employer of respondent at all times he was under a duty to see to it that respondent had a safe place to work. The court instructed the jury as to this duty of Brown, and there was evidence that Brown had neither inspected these fastenings himself nor had anyone do it for him.

At the request of appellants the trial court instructed the jury that as the employer of respondent Brown had certain special duties defined in Labor Code section 6400 to the effect that every employer is obligated to furnish a safe place of employment for his employees. The court gave the instruction but modified it by deleting therefrom section 3414 of title 8 of the California Administrative Code which provides that employees shall not ride on top of loads that may dangerously shift, topple over or otherwise become unstable. It is true, as appellants contend, that a general safety order applies to all employers and in this case applied to Brown; that such safety orders are promulgated for the purpose of protecting the safety of employees and as such establish a standard of care for employers. Although research has not disclosed a judicial interpretation of this safety order, we think it clear that under circumstances here it had no application. The section reads as follows: "Riding Loads. Employees shall not ride on top of loads that may dangerously shift, topple over or otherwise become unstable. Employees shall be seated if riding on a load." We think the safety order in this aspect was concerned only with transportation of employees on top of loads that may shift, topple over or otherwise become unstable and did not apply here, where in order to do the work respondent and his companion were required to shovel sand into the hopper of the spreader. There was much undisputed evidence that this method of spreading sand with a spreader attached to the tailgate of the dump truck was, and for years had been, a standard and commonly accepted method of doing the work. Respondent was not "riding on top of the load" within the meaning of the safety order.

Appellants further object to several instructions based upon their claim that Brown was the special employer of the truck driver. What we have already said disposes of these contentions.

Appellants' final contention is that the court should have granted a mistrial because a question put to a witness by counsel for the intervening insurance carrier of Brown elicited a response that appellants had liability insurance.

The incident arose in the following manner: The driver denied on the stand that there was a pin missing from the tailgate latch mechanism. A prior statement made by him to an insurance investigator engaged by the intervener was introduced to impeach him. The driver had told the investigator that he had noticed the pin missing the day before the

accident. On the stand, however, he denied that he had made this statement to the investigator and said he had read the statement as taken down by the investigator. (He had signed the statement and initialed each page.) He claimed that he signed the statement in a hurry and that the investigator was overbearing.

The investigator was then called by the intervener. He was asked if, at the time the truck driver made the statement, he had indicated that he had given the information to anyone else. The answer was: ". . . He told me that he had given information to another insurance adjuster for his employer." We may assume that this answer informed the jury that Riley had insurance and there is abundant authority in California that intentional gratuitous references, either in the evidence or the argument, to the fact that a defendant carries liability insurance may be prejudicial misconduct justifying a reversal. (*Little* v. *Superior Court,* 55 Cal.2d 642, 645 [12 Cal.Rptr. 481, 361 P.2d 13].) When the incident occurred during trial a motion for mistrial was made and denied. In discussing the motion the court said: "[O]ver the years there has been a great deal of dither on the subject of insurance, and it has generally been held prejudicial to mention it. The rationale underlying that rule becomes attenuated by time in an age where practically everybody has insurance. I still believe, however, that it is error to drag it in wilfully and unnecessarily for no other purpose than to show that the defendant is protected. But I am inclined to think the rule now is that if the matter comes in to the case for some other reason or purpose in itself, that incidental reference to the fact of insurance would not be erroneous.

"Mr. Knudson here takes the position that this statement was elicited from him by some measure of duress incident to the time involved, and by some measure of haste and confusion on his own part. It would appear to be logical from that point of view to inquire if he had any experience in the giving or taking of statements, particularly pertaining to this matter. And while that is a rather incidental purpose, the reference is also so very incidental that I am inclined to think the appropriate thing to do is to ignore it completely.

"Motion for mistrial is denied. More so in view of the language that this was the adjuster for his employer, as it would be obvious that whether or not the employer carried liability insurance he certainly would carry compensation insurance."

We think the trial court's comment above quoted, made upon denial of the motion for mistrial, was pertinent, reasonable and well within the discretion of a trial judge ruling on such a motion at the trial. We think further that the ruling on the motion for new trial was well within the discretion possessed by a trial judge in ruling upon such a motion. In any event, we could not say that if error there was, the error under the constitutional provision was reversible.

The judgment is affirmed.

Friedman, Acting P. J., and Regan, J., concurred.

A petition for a rehearing was denied February 23, 1966, and appellants' petition for a hearing by the Supreme Court was denied March 22, 1966.

[Civ. No. 525. Fifth Dist. Jan. 26, 1966.]

HAZEL M. LAMBERT, Plaintiff and Appellant, v. FRANK I. RANEY, JR., Defendant and Respondent.

T. N. Petersen for Plaintiff and Appellant.

Meux, Gallagher, Baker & Manock, Peart, Baraty & Hassard and David E. Willett for Defendant and Respondent.

STONE, J.—Plaintiff appeals from an order dismissing action for failure to serve and return summons within three years, and from an order denying issuance of alias summons, a nonappealable order under Code of Civil Procedure section 963 which may be reviewed on appeal from the judgment. (*Price* v. *Hibbs*, 225 Cal.App.2d 209, 212 [37 Cal.Rptr. 270].)

Section 581a of the Code of Civil Procedure requires dismissal "unless the summons shall be served and return thereon made within three years after the commencement of said action, . . . provided, that . . . no dismissal shall be had under this section as to any defendant because of the failure to serve summons on him during his absence from the State, or while he has secreted himself within the State to prevent the service of summons on him."

*Chronology*

September 8, 1961—Complaint filed against defendant and a codefendant.

May 11, 1964—Summons served on the codefendant.

June 24, 1964—Summons returned and filed.

October 13, 1964—Defendant filed notice of motion to dismiss under Code of Civil Procedure section 581a.

November 2, 1964—Motion to dismiss granted, then vacated by same order, and motion reset for November 24, 1964.

November 24, 1964—Counsel for plaintiff granted permis-

sion to take deposition of defendant to ascertain absence from the state during three-year period.

December 16, 1964—Plaintiff filed affidavit in opposition to motion to dismiss, alleging defendant's admission of absence from state for a period of 64 days between September 8, 1961, and October 22, 1964.

January 15, 1965—The court found respondent had been absent from state a total of 64 days; that three years plus 64 days expired November 12, 1964. Plaintiff's attorney orally moved for issuance of alias summons, the court requested a formal motion.

January 19, 1965—Motion for issuance of alias summons and motion for dismissal heard, and submitted.

January 26, 1965—Motion for dismissal granted under Code of Civil Procedure section 581a, and motion for issuance of alias summons denied.

■ We take up, first, defendant's threshold argument that plaintiff's failure to allege and prove attempted service during the three-year period precludes her from relief under Code of Civil Procedure section 581a. Defendant confuses exigencies of proof with a condition precedent. Whether a defendant has secreted himself within the state is often difficult to prove, indeed, a plaintiff can hardly prove the fact unless service is attempted. On the other hand, absence from the state usually can be proved with exactness by discovery procedures, here, a simple interrogatory served the purpose. Thus, although a plaintiff's right to relief under section 581a may frequently rest on proof of attempted service, such proof is not indispensable. We conclude that proof of absence from the state tolls the running of the three-year period whether or not service is attempted.

■ Plaintiff argues that the period of absence from the state is not controlling and that even though three years plus the 64 days defendant was absent had elapsed at the time of hearing, the court had discretion to allow plaintiff an additional reasonable time to serve defendant. Plaintiff leans heavily on *Wyoming Pacific Oil Co.* v. *Preston,* 50 Cal.2d 736, 740-741 [329 P.2d 489], which discusses Code of Civil Procedure section 583 in relation to section 581a. The Supreme Court observed that a trial court has discretion to grant relief under section 583 if it is impossible or impracticable for the plaintiff to proceed to trial. These same principles, said the court, should be followed in applying the exceptions of 581a relating to service of summons on a defendant. *Wyoming-*

*Pacific* was concerned with a defendant concealing himself within the state. The plaintiff effected personal service upon the defendant seven days after the three-year period elapsed. We are not told the number of days the defendant concealed himself within the state to avoid service, nor what correlation there was, if any, between the period he avoided service and the extended time for service. The facts do make it clear, however, that the defendant was not merely absent from the state, he made service impossible and impracticable by secreting himself within the state. The Supreme Court held that it was within the discretion of the trial court to give the plaintiff relief from the effect of the defendant's chicanery, in other words, that the defendant by his own deceit entitled plaintiff to relief under section 581a.

Defendant here did nothing to deceive plaintiff nor to thwart service; he simply made trips outside the state. It was neither impossible nor impracticable to serve him within the three-year and 64-day period. Under similar circumstances in *Dresser* v. *Superior Court,* 231 Cal.App.2d 68, the court said, at page 73 [41 Cal.Rptr. 473] : "The statute is mandatory and jurisdictional and, as to any action falling within its compass, the court 'has power to act only in a certain way, that is, by ordering a dismissal.' "

■ Plaintiff asserts that even though defendant did not secrete himself to avoid service, he did, by filing a motion to dismiss on October 13 before the three years and 64 days elapsed, make it "impracticable or impossible" to effect service. Plaintiff argues that the county clerk would not have issued an alias summons while the motion was pending; but this argument erroneously presupposes that the mere filing of a motion to dismiss holds all proceedings in abeyance pending its disposition. This is not so; it does not prevent service of summons, and nothing prevented plaintiff from requesting an alias summons. Had the county clerk refused to issue it, plaintiff could have instituted proper proceedings to require that one issue. However, plaintiff made no application for an alias summons until January 15, 1965, some two months after the three-year and 64-day period had elapsed on November 12, 1964.

There was an abortive order November 2 granting defendant's motion to dismiss 10 days before the extended period for service expired, but it has no relevancy since as part of the same order on the same day the court vacated the dismissal order. Although making and vacating an order simul-

taneously is anomalous, it is clear enough the order did not preclude plaintiff from applying for an alias summons to serve defendant and thereby comply with section 581a.

■ Plaintiff makes the further argument that if it was not impossible to serve defendant, it was at least impracticable during the pendency of defendant's motion to dismiss, and therefore the time that elapsed during the pendency of the motion should be excluded. A like argument was made as to the application of Code of Civil Procedure section 583 in *Governale* v. *Bethlehem Pac. Coast Steel Corp.*, 235 Cal.App. 2d 837, and in rejecting the argument the court said, at page 841 [45 Cal.Rptr. 707]: "Appellant first argues that the period of time during which respondent Hyman-Michaels' motion to quash service of summons was pending should be excluded from the five-year period because during that time the court lost jurisdiction of the case and hence trial was impossible. This argument is unsupported by authority. It seems plain that time consumed in disposition of the motion to quash service of process, like that necessarily consumed in the disposition of a demurrer, a motion to strike, or an amendment to the pleadings, or while waiting for a place on the court's calendar must be included in the five-year period. [Citation.] The mere fact that such a motion was made had no effect upon the court's jurisdiction."

The foregoing principle is applicable here, the time consumed by proceedings on motion to dismiss must be included in the three-year plus 64-day period. We conclude that under the facts of this case dismissal was mandatory upon the expiration of the period of three years provided by Code of Civil Procedure section 581a plus the additional 64 days that accrued by reason of defendant's absence from the state.

In view of our holding that the court did not err in dismissing the action, it follows there was no error in denying plaintiff's motion for issuance of an alias summons.

The orders are affirmed.

Conley, P. J., and Brown (R. M.), J., concurred.

[Civ. No. 22563. First Dist., Div. One. Jan. 27, 1966.]

CONDERBACK, INCORPORATED, Plaintiff and Respondent, v. STANDARD OIL COMPANY OF CALIFORNIA, Defendant and Appellant.

Pillsbury, Madison & Sutro, Francis R. Kirkham, Thomas E. Haven and Anthony P. Brown for Defendant and Appellant.

FitzSimmons & Petris, Edward R. FitzSimmons and Roderic Duncan for Plaintiff and Respondent.

SULLIVAN, P. J.—Defendant Standard Oil Company of California (Standard) appeals from a judgment entered upon a jury verdict in favor of plaintiff Conderback, Incorporated (Conderback) in the sum of $154,374.45 with interest and costs.

The action was brought to recover the balance allegedly due on a contract for the construction, designing, maintenance and dismantling of Standard's exhibit at the Seattle World's Fair in 1962. There were two jury trials. On defendant's motion, the cause first proceeded to trial on the issues raised by the separate defenses of account stated, accord and satisfaction and compromise and release set forth

in defendant's answer and in the cross-complaint. (Code Civ. Proc., § 597.) By their negative answers to two special interrogatories submitted to them,[1] the jury in substance found that the parties had not agreed between themselves at either of the times therein specified as to what was the total amount then due Conderback. The cause then proceeded to a second trial before a different jury on the main issue dealing with the terms of the agreement entered into by the parties. The jury returned a verdict in favor of Conderback in the amount indicated above. This appeal followed.

At all times here material, Conderback was a California corporation engaged in the business of building advertising exhibits.[2] It had been organized in 1957 and had its principal place of business in San Francisco. All of its capital stock was owned by Marinus van der Woert and Edward Railsback, its president and vice-president respectively. Prior to the formation of Conderback, Railsback had been continuously employed in the exhibit business since 1935 and had personally done work for Standard since 1939. Van der Woert had worked in the exhibit display business since 1946 and during that time on exhibits for Standard. Both men had been employees together in the same exhibit building firm and were able to acquire some of the accounts, including that of Standard, when the firm ceased doing business.

From the time they organized Conderback, Railsback and van der Woert had continuous business dealings with the advertising department of Standard, approximately 90 percent of the time with either M. A. Mattes, the advertising manager, or Jeff Kersh, an employee in the department. From 1960 until it suspended its operations, Conderback did over 300 jobs for Standard's advertising department. Among these were Standard's exhibits at the California State Fair, which Conderback built each year. Railsback considered Standard to be one of Conderback's better accounts. However, prior to the Seattle World's Fair job, the largest job

---

[1]The special interrogatories were: ''1. Did the parties agree between themselves in July or August of 1962 as to the total amount due Conderback, Inc. for the erection of the building and the construction and installation of displays in the building at the Seattle World's Fair; 2. Did the parties agree between themselves in January, 1963, as to all sums due Conderback for all work done by Conderback, Inc. for Standard Oil at the Seattle World's Fair.''

[2]Conderback suspended business activities in July 1963, approximately two months after the commencement of this action on May 13, 1963. It was not a going business at the time of trial.

done by Conderback for Standard was at the Portland Centennial involving an expenditure of about $40,000. The Seattle job was 10 times larger than any job Conderback had done for anyone.

In their years of working together on more than 300 jobs, there had never been any litigation between Conderback and Standard over the former's billings. According to their customary way of working together, Conderback would "be notified that there was a job coming up and we had a certain budget to adhere to. We would then come back to the shop and design within this budget and endeavor to hold the budget price that they had given us." An estimate would be given through the use of a basic formula but at the end of the job an adjustment would usually be made based on the same formula to take care of changes and additions.[3] This applied to so-called "time and material" business as distinguished from "bid" business which was billed at the bid price. There was testimony that Conderback's methods of estimating and billing were discussed with Standard and that the latter was well aware of them. The increase of the markup on subcontracted work (see fn. 3, *ante*) had also been discussed with Standard who had assured Conderback that this so-called agency markup should and could be used.

The Seattle World's Fair was scheduled to open on April 21, 1962. In the spring of 1961, Railsback and van der Woert met with Mattes, advertising manager of Standard, to discuss the possibility of having Conderback handle Standard's exhibit at the Fair. Mattes inquired as to whether the project was beyond the "scope" of Conderback and was assured by the latter's representatives that they could handle the job since much of the work would be subcontracted. Mattes was told that because Conderback was a small company and the project was a large one, Conderback would have to bill Standard in advance of any expenditures. Mattes selected Conderback to do the job. There were no other competitive bidders.

---

[3]In general outline, Conderback's standard formula which it had used over the years consisted of the following principal factors: (a) the cost of labor plus a 100 percent markup plus an additional markup for fringe benefits; (b) the cost of materials plus a 50 percent markup; (c) the cost of subcontracted work plus a 10 percent markup "as a rule," subsequently changed to 17.625 percent as an "agency markup" customarily paid agencies by Standard when they supervised subcontractors.

During these preliminary discussions Mattes advised Conderback that his department had authority for a budget of $230,000 for the project "plus a 10 per cent discretionary factor."[4] On July 6, 1961, Conderback wrote to Mattes: "Confirming our discussions . . . we believe the exhibit as presented, including tentative individual displays, can be constructed, with minor modifications, for the $230,000.00 budget plus the 10% override."[5] This letter was signed by both van der Woert and Railsback and underneath said signatures contained the language "ACCEPTED BY Standard Oil Company of California" with space provided for signature and date. Mattes acknowledged acceptance on the same date. Railsback testified that the letter-contract of July 6, 1961, was entered into on the basis of the budgeted amount. The next day, July 7, 1961, Standard, through Mattes, issued its purchase order to Conderback for "Century 21 Exhibit—Seattle," covering exhibit building and displays, but silent as to any specified price.[6] At this time there were no plans in existence.

Conderback started work almost immediately. To design Standard's building at the Fair, it retained one Tepper who was to work directly with Railsback and van der Woert, but who soon "bypassed" them at Mattes' request and worked with the latter who approved the building and all exhibits before Conderback saw them. Conderback also retained an architect and an engineer and entered into a number of subcontracts for the performance of the construction work. The subcontractors billed Conderback for the work done and the latter in turn eventually billed Standard for the same

[4]This followed a letter of June 15, 1961, from Conderback to Mattes offering an "estimated quotation for budgeting purposes only" of $275,194.

[5]The letter further stated that "any major changes from building model or additional mechanical displays, we are sure you will understand, will be confirmed in writing and subject to negotiation" and presented a plan for payment consisting of "a blanket advance progress billing substantiated within 30 days" to be made on the first of each month, payment thereon on the 10th of the month, and "detailed billing for the payment . . . by the end of the month." There is testimony that these arrangements were made because Conderback did not have "the cash load to finance this job."

[6]This purchase order is attached to and incorporated by reference in plaintiff's amended complaint which alleges the delivery thereof on July 7, 1961, defendant's promise to pay for labor, material and expenses, plus amounts for overhead and profit, and the delivery on August 10, 1961, of a modification (request for adjustment) of such order. Plaintiff's amended complaint is based solely upon such purchase order and modification.

amounts plus a markup for the supervision of the work involved.

The concept of the Century 21 Exhibit as designed within the limits of the initial budget of $230,000 soon started changing and continued to change up to and even after the Fair opened in April 1962. These changes were made principally by Mattes. At first Conderback did not challenge his decisions but finally at the beginning of 1962 the matter "was so far out of hand that . . . [Conderback] could never catch up," since it had no control of the budget or the design or the coordination between them. When Railsback raised some question about completing on time the work as modified, Mattes replied "Let's get the job done, we will worry about that later."

At about this time—February 1962—the parties realized that the job had already cost more than the initial budget figure of $230,000. Standard thereupon requested from Conderback a written estimate of the total cost of the job. According to Standard's Whitmore, this was required for budgetary reasons. In compliance with the request, Conderback wrote to Standard on February 12, 1962, giving an itemized breakdown of costs and noting that to date there were total authorized expenditures of $307,518.12.[7] Standard then requested a firm bid on the amount required to finish the job. In reply Conderback on February 26, 1962, sent Standard "our firm bid" for the Century 21 Exhibit in the sum of $351,587.20 based on the detailed breakdown furnished in its letter of February 12, 1962.[8] Standard accepted and confirmed this "firm bid" by its letter of March 23, 1962.[9]

[7]The letter stated in part: "At the inception of this project, we offered our original estimate to you for $275,000.00. This was subsequently formalized in writing for $253,000.00 and we undertook the project. Since starting the project there has been a series of changes and additions to the project. To date we have written and verbal approval for the following changes and additions" in the amount of $307,518.12 including "Formal estimate" of $253,000 (apparently $230,000 plus the 10 percent override). It concluded: "The changes and additions listed on the above and preceding pages have materially increased our original estimate to you for the entire exhibit. It is hoped that these changes and additions *can be negotiated and approved* as soon as possible so that our delivery date will not be impaired." (Italics added.)

[8]The letter concluded: "The price is based on designs and details *as planned as of* February 12, 1962. Any *major changes or additions* requested to the project *will be negotiated* and *confirmed to you in writing* before expense is incurred." (Italics added.)

[9]This is made the basis of Standard's first affirmative defense and of all four counts of its cross-complaint.

The Fair exhibit opened on time. During the next two months, Standard made several requests for a final billing. On June 15, 1962, Conderback's van der Woert wrote Mattes attaching "our breakdown sheets covering expenses incurred by our Company to June 1, 1962." Explaining "over-budget expenditures,"[10] Conderback requested an opportunity to meet with Mattes and "to negotiate the outcome of these expenditures." "Actual costs as of 6-1-62" were scheduled at *$520,134.17* of which $344,465.31 was noted as "paid." Conderback requested payment "at this time" of $137,405.49, which did not include balance of maintenance costs, dismantling costs or State of Washington sales tax.

There ensued a number of meetings between the representatives of the parties. In the meantime Conderback was rceiving invoices after June 1—the cutoff date of their June 15 billing. Standard indicated that it was not willing to discuss these latter invoices at the time. On June 30, 1962, Conderback's van der Woert wrote to Mattes attaching "schedules covering costs . . . to June 1, 1962, maintenance costs for the exhibit to October 26, 1962, and costs incurred during the month of June" but holding in abeyance design fees and sales tax. Total actual costs to June 1, 1962, were therein scheduled at $525,134.17, of which the same amount was noted paid as in the June 15 schedule and $109,762.23 was the "additional requested." The parties agreed upon a number of the items for which Conderback thereupon invoiced Standard on July 11, 1962, in the sum of $66,794.01 and was paid. On July 26, 1962, Conderback again invoiced Standard for specified items totalling $39,848.87.[11] The invoice was not designated a final billing. Eventually Standard agreed to pay the invoice. Standard's Whitmore testified at the first trial that he wanted a reassurance from Conderback that it was the final payment on the building and exhibits. Railsback on the other hand testified that he attended all the meetings, that he never heard of such a statement and that it was not a condition of the payment of either the July 11 or the July 26 invoice. Defendant's claim is that it specifically conditioned its agreement to pay the July 26 invoice on the receipt of an

---

[10]This was attributed to: (1) Conderback's inability to coordinate design with estimated budget; (2) numerous changes to exhibits, art and copy; (3) necessity of quoting in "our February 12, 1962 budget quotation" on many exhibits not then in final design concept.

[11]Attached schedules showed $418,759.32 as of July 16, 1962, plus the "Additional Requested" and invoiced of $39,848.87 producing a grand total of $458,608.19, of which $411,259.32 had been paid.

assurance from Conderback that this was the final billing and that such assurance was received in the form of Conderback's letter of August 2, 1962.[12] Standard paid the full amount of the July 26 invoice. There was no indication on the check that it was in final payment.

Nevertheless, after these events upon which Standard based its claim of final settlement, said defendant paid $1,871.80 to Conderback, most of which represented charges for work done prior to May 28, 1962. Additionally, on September 14, 1962, van der Woert wrote to Mattes "listing the developments to date regarding the following unpaid accounts."[13] Eventually in the fall of 1962, Conderback settled its obligations with the designer and its sales tax liability to the State of Washington. Although the parties differ as to the basic contract under which the work was being done, they appear to agree that under either of their respective theories, the total amount to be paid by Standard to Conderback could not be arrived at until the above two liabilities had been determined.

In December 1962, van der Woert telephoned Whitmore, advising that there were some additional bills.[14] On January

---

[12]This letter to Mattes from van der Woert was embraced within the first special interrogatory at the first trial (see fn. 1, *ante*). It read: "Regarding our invoice 21000-11, dated July 26, 1962, the amount will cover *final billing* for the erection of the building and construction and installation of the displays within the exhibit building. The amount *does not include* maintenance, dismantling, sales tax, additional design fees, nor additional changes to the exhibit since June 1, 1962." (Italics added.)

Andrew Leong, office manager and accountant for Conderback, gave the following explanation at the first trial as to how the letter came to be written: On August 2, 1962, Standard's Whitmore telephoned him and requested such a letter, even dictating the first sentence. Whitmore gave no indication that this was the agreement of the principals and at the time both Railsback and van der Woert were out of the office. Leong had the letter typed and placed on van der Woert's desk for signature. Van der Woert then signed the letter assuming that it referred to the finality of that particular billing.

[13]This letter referred to three subcontractors and Tepper, the designer. It concluded by stating that Conderback had never included the amounts from the first three to Standard "in our final billing. We feel that if the explanations are satisfactory, we will negotiate with them."

[14]According to Whitmore, whose testimony is relied upon by both parties on this point, van der Woert said there were a number of items previously understood not to be Standard's responsibility which van der Woert had not been able to negotiate with subcontractors in Seattle. He inquired whether Whitmore "would meet with him and discuss whether or not Standard would be willing to pick up some of these costs because he was going to be stuck with them, and I said yes, I would meet with him, . . ." After the meeting, Whitmore requested van der Woert to send a list of the items.

9, 1963, Conderback sent a list totalling $25,878.21, including the sales tax liability of $19,842.11 and thus representing additional items of $6,036.10.[15] Whitmore testified that he telephoned van der Woert and told him the items Standard would pay; that Conderback then sent an invoice therefor which Standard returned because it did not contain the words "final billing," and that on January 21, 1963, Conderback sent an acceptable invoice.[16] Standard paid the sum of $2,025.13.

By this time, Conderback's Leong, who had run an audit on the Fair job, had left the company. Railsback had been hospitalized with a serious illness until January 3, 1963, and the two Conderback officers had decided to defer discussion with Standard of the application "of our formula to the costs that we had incurred. . . ."[17] Railsback and van der Woert, with the help of an outside auditor, then started "to re-audit this job on a complete and thorough basis" in the latter part of January and the first part of February. In early March 1963, they contacted Mattes and asked for an opportunity to present their final bill. A meeting was held at which Conderback submitted and left with Standard for its examination all of the work sheets of the reaudit together with their supporting data. Other discussions followed with Standard's representatives. There was testimony that the manager of Standard's purchase and stores department indicated that after the $230,000 limit of the original purchase order had been passed, the job should have been handled on a cost-plus-*fixed-fee* basis. Conderback indicated it merely wanted its existing formula applied. At one point, Standard's representatives offered a 17.625 percent markup on

[15]The list not in the form of an invoice was captioned: "Standard Oil Company Final Billing Century 21 World's Fair."

[16]In the sum of $3,110.19 (later adjusted) and captioned "Re: Standard Oil Company of California final billing, Century 21, World's Fair."

[17]According to plaintiff's contentions made at the pretrial conference and plaintiff's evidence at trial, the sum to be paid plaintiff for the completion of the entire job was to be computed by the following formula: (1) the amount paid by plaintiff to its subcontractors plus a 17.625 percent markup for supervision; (2) plaintiff's own labor costs plus 100 percent markup, plus 19.8 percent of said labor costs to cover fringe benefits, plus an additional 10 percent on the total sum; (3) plaintiff's own cost of materials plus a markup of 50 percent; (4) miscellaneous direct expenditures, e.g., freight and telephone, plus a 10 percent markup; and (5) expenses of plaintiff's officers while in Seattle at $200 a day each (compare customary formula of plaintiff as outlined in fn. 3, *ante*). Railsback testified that by agreement between the parties, the above formula was to be applied to the contract entered into.

some of the overall costs of the job which would give Conderback an additional $7,000. Upon its refusal, Mattes telephoned Railsback and "offered a different formula that amounted to $28,000" which was also rejected. Conderback insisted that it wanted its existing formula, which, according to Railsback's testimony, "would have been in the vicinity of $664,000." Conderback then demanded payment of said sum less approximately $494,000 theretofore paid. The demand was rejected and the present action commenced.[18]

Standard's first attack is aimed at the very heart of the judgment. It contends that Conderback could not bring or maintain the present action since it was acting in the capacity of a contractor in California without being duly licensed.[19] In substance defendant argues that all negotiations and correspondence leading up to the contract between the parties, the contractual arrangements themselves and certain contracts between Conderback and the designer, architect and engineer of the project all took place in San Francisco, where the principals herein and the other persons mentioned all had their respective offices. At the same time Standard admits, as it must, that the building which was the subject of the project was intended to be, and in fact was, constructed outside of the State of California and in the State of Washington and has conceded both in its briefs and at oral argument that its contention is confined to and is predicated solely upon those acts of Conderback which occurred in the State of California.

Section 7028 of the Business and Professions Code[20] makes it *"unlawful* for any person to engage in the business or *act*

[18]On May 31, 1963, the amended complaint prayed for judgment in the sum of $171,026.80 ($665,400.85 less $494,374.05 paid).

[19]This issue was not raised by the pleadings or designated as an issue in dispute in the interlocutory pretrial conference order made before the first trial. At the start of the first trial it was asserted in a trial memorandum filed by defendant. It was thereafter raised in defendant's motion for a judgment notwithstanding the verdict (necessarily made after the second trial) upon denial of which the court stated: "It is my opinion and the Court finds that plaintiff did not have to possess a California Contractor's license for the performance of the work in the State of Washington; . . ." Although the issue was timely raised below, "It is immaterial that the parties, whether by inadvertence or consent, even at the trial do not raise the issue. The court may do so of its own motion when the testimony produces evidence of illegality. [Citation.] It is not too late to raise the issue on motion for new trial [citation], in a proceeding to enforce an arbitration award [citation], or even on appeal. [Citation.]" (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 148 [308 P.2d 713].)

[20]Hereafter unless otherwise indicated all section references are to the Business and Professions Code.

*in the capacity of a contractor within this State* without having a license therefor, . . .'' (Italics added.) Section 7030 at all times material herein provided:[21] ''Any person who *acts in the capacity of a contractor* without a license is guilty of a misdemeanor.'' (Italics added.) Section 7026 of said code defines contractor as follows: ''The term contractor for the purposes of this chapter is synonymous with the term 'builder' and, within the meaning of this chapter, a contractor is any person, who *undertakes* to or offers to undertake to or purports to have the capacity to undertake to or submit a bid to, or does himself or by or through others, *construct,* . . . or *demolish* any *building,* . . . or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith. The term contractor includes subcontractor and specialty contractor.'' (Italics added.)

Section 7031 provides: ''No person engaged in the business or *acting in the capacity of a contractor,* may bring or maintain any action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract.'' (Italics added.)

Conderback concedes, and the record shows, that it was not a licensed contractor in California at any time. Its basic position is that the California Contractors' License Law (Bus. & Prof. Code, §§ 7000-7145) does not extend to construction outside of California although it has not squarely met defendant's argument that Conderback's acts within the state were done in the capacity of a contractor so as to make the law operative against it. Neither of the parties has cited, nor have we found, any case involving a similar question.

It is clear at the outset, as indeed defendant seems to concede, that where a state in the proper exercise of its police power enacts statutes, such as those now before us, regulating a business and requiring a license to be obtained by anyone engaged therein (*Riley* v. *Chambers* (1919) 181 Cal. 589, 592-593 [185 P. 855, 8 A.L.R. 418]; *Drummey* v. *State Board of Funeral Directors* (1939) 13 Cal.2d 75, 79 [87 P.2d 848]; *In re Fuller* (1940) 15 Cal.2d 425, 428-431 [102 P.2d 321];

---

[21]Section 7030 was repealed in 1963 and in substance incorporated within section 7028, which was amended at the same time.

*Rosenblatt* v. *California State Board of Pharmacy* (1945) 69 Cal.App.2d 69, 72-73 [158 P.2d 199]; *Doyle* v. *Board of Barber Examiners* (1963) 219 Cal.App.2d 504, 509-510 [33 Cal. Rptr. 349]), the exercise of this regulatory power is necessarily limited to activities carried on within the territorial limits of such state. (See generally, 53 C.J.S., Licenses, § 6, pp. 464-469; 33 Am.Jur., Licenses, §§ 7-8, pp. 330-332.) Therefore it seems to us that the purpose of any given regulatory statute must be examined in the perspective of such constitutional principle.

In the much cited case of *Howard* v. *State of California* (1948) 85 Cal.App.2d 361, 365-366 [163 P.2d 11], it was said: "The purpose of the act is to guard the public against the consequences of incompetent workmanship, imposition and deception. In order to procure a license an applicant is required to make a showing of good character and of a degree of experience and general knowledge of the building, health, safety and lien laws of this state, and of the rudimentary administrative principles of the contracting business, as the board deems necessary for the safety and protection of the public. (§§ 7068, 7069.) Willful breaches of contract and other willful and fraudulent acts, causing material injury to another, furnish grounds for suspension or revocation of a license. (§§ 7109-7119.) . . . The statute in question expresses the judgment of the Legislature that the prospect of having to pay damages for incompetence, fraud and breach of contract, is not an adequate deterrent from wrongful practices in the building trades." Substantially the same views on the purpose of the Contractors' License Law have been expressed in other cases. (See *Loving & Evans* v. *Blick* (1949) 33 Cal.2d 603, 609 [204 P.2d 23]; *Franklin* v. *Nat C. Goldstone Agency* (1949) 33 Cal.2d 628, 632 [204 P.2d 37]; *Fraenkel* v. *Bank of America* (1953) 40 Cal.2d 845, 848 [256 P.2d 569]; *Bowline* v. *Gries* (1950) 97 Cal.App.2d 741, 743 [218 P.2d 806]; *Bierman* v. *Hagstrom Constr. Co.* (1959) 176 Cal.App.2d 771, 775 [1 Cal.Rptr. 826, 82 A.L.R. 1424]; *G & P Electric Co.* v. *Dumont Constr. Co.* (1961) 194 Cal.App. 2d 868, 879-880 [15 Cal.Rptr. 757]; *Steinbrenner* v. *J. A. Waterbury Constr. Co.* (1963) 212 Cal.App.2d 661, 666 [28 Cal.Rptr. 204].) In *Bowline, supra,* the court said: "The underlying purpose of the contractor's license law is to protect the general public respecting structural improvements to real property wherein special skill, training and ability are required." (97 Cal.App.2d 741, 743.) In *Fraenkel, supra,* it

was said: "That law was enacted for the safety and protection of the public against imposition by persons inexperienced in contracting work, and for the prevention of fraudulent acts by contractors resulting in loss to subcontractors, materialmen, employees, and owners of structures. [Citations.]" (40 Cal.2d at p. 848.) The same objective of promoting the "safety and protection of the public" by prohibiting inexperienced persons from engaging in contracting work had been emphasized by the Supreme Court in its previous decisions in *Gatti* v. *Highland Park Builders, Inc.* (1946) 27 Cal.2d 687, 690 [166 P.2d 265] and *Loving & Evans* v. *Blick, supra.*

Examined in the context of these cases, the concern for the public inherent in the statute centers upon building done in California and practices of the building trades in this state (*Howard* v. *State of California, supra,* 85 Cal.App.2d 361, 366); it focuses upon all those who may be involved in such building—subcontractors, materialmen, employees and owners (*Fraenkel* v. *Bank of America, supra,* 40 Cal.2d 845, 848); and it is thus the motivating influence in the policing of such work and practices for the protection of all concerned. Thus, as the above authorities point out, the law requires that an applicant for a contractor's license "show such degree of knowledge and experience in the classification applied for, and such general knowledge of the *building, safety, health and lien laws of the State* and of the administrative principles of the contracting business as the board deems necessary for the *safety and protection of the public*" (italics added; § 7068 as amended in 1963) and makes detailed provision for the investigation of the acts of contractors and for disciplinary proceedings in connection therewith. (§§ 7090-7124.1.) Among the causes and grounds for discipline (§§ 7107-7120) is the "Willful or deliberate disregard and violation of the *building laws of the state,* or of any political subdivision thereof, or of the *safety laws or labor laws or compensation insurance laws or Unemployment Insurance Code of the state,* or violation by any licensee of any provision of the *Health and Safety Code or Water Code,* . . ." (Italics added.) (§ 7110 as amended in 1965.)

In our view, it was not the purpose of the Legislature in enacting the Contractors' License Law to bring within its ambit a person who, not otherwise engaged in the contracting business in California, merely enters into negotiations or contracts in this state for a construction work or project in another state or foreign country. The purpose of the law is to

protect the public in California against incompetent and dishonest persons who do, or offer, undertake or contract to do, building in this state or represent that they have the capacity for such work in California. This objective of the law is insured by inspecting their building practices in this state and holding them accountable for a wilful disregard of California building and other laws. The above purpose and objective are not subserved by making subject to the license law those persons who do not contemplate any construction work in California but merely enter into negotiations and contracts here for construction work to be done outside the jurisdiction of California and beyond the reach of its building laws. By way of illustration, the legislative purpose would not be furthered in the instant case if we were to hold that a contractor duly licensed by the State of Washington would be required to have a California contractor's license before he could meet, negotiate and contract with Standard at the latter's offices in San Francisco for the construction of Standard's exhibit at the World's Fair in Seattle. We venture to say that many corporations of national and international size and scope of operations with executive and administrative offices located in this state negotiate and contract here for the construction of buildings and projects in other states and in foreign countries. It could not have been reasonably intended by the Legislature that all persons thus dealing with such corporations would be required to qualify for and obtain a California contractor's license. Nor could it have been reasonably intended that since they were subject to the Contractors' License Law, there was thereupon imposed upon the Contractors' State License Board (§§ 7000; 7011-7013; 7090-7098) the insuperable burden of investigating and passing upon the building practices of such persons all over the world. Basically, Conderback is in no different position.

We hold that where, as in the instant case, a person offers, undertakes or contracts in this state to construct or demolish a building, project or other improvement located outside of California, such person does not thereby become one engaged in the business or acting in the capacity of a contractor within this state so as to be subject to the Contractors' License Law. Nor does the mere fact that, as here, such person's principal place of business is in California necessarily compel a different conclusion.

Defendant refers us to *Lewis & Queen* v. *N. M. Ball Sons*

(1957) 48 Cal.2d 141 [308 P.2d 713], as authority for its proposition that the site of the actual construction work is immaterial since plaintiff did much of the administrative work for the Seattle project in San Francisco. But defendant takes the emphasized language of *Lewis & Queen* out of its context. That case involved physical work of construction *within* California and the point of the language relied upon by defendant was that in respect to such work it was intended by the Legislature that the partner-contractor who had charge of the administrative functions of the business should qualify under the law just as much as the partner-contractor who supervised the actual work of construction. There is nothing inconsistent between this holding and the conclusion we have reached herein.

Standard next contends that according to the undisputed evidence the parties after the completion of the job reached an agreement as to the amounts due Conderback which Standard promptly paid and that Conderback is bound by "the account stated by it and by the accord and satisfaction reached." It will be recalled that these and other special defenses were the subject of the first trial at which a jury returned a verdict rejecting them. It is now urged that there is no evidence supportive of such verdict and that this case is controlled by *Potter* v. *Pacific Coast Lumber Co.* (1951) 37 Cal.2d 592 [234 P.2d 16] and *Creighton* v. *Gregory* (1904) 142 Cal. 34 [75 P. 569]. Although Standard broadly states that all three of its special defenses are established on the record, it confines its argument and authorities to the defense of accord and satisfaction.

This defense is defined by Civil Code sections 1521 and 1523: "An accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled." "Acceptance, by the creditor, of the consideration of an accord extinguishes the obligation, and is called satisfaction."

█ The question whether an agreement amounts to an accord and satisfaction is one of the intention of the parties and is therefore a question of fact. (*Lapp-Gifford Co.* v. *Muscoy Water Co.* (1913) 166 Cal. 25, 27 [134 P. 989]; *Dietl* v. *Heisler* (1961) 188 Cal.App.2d 358, 363 [10 Cal.Rptr. 587]; *Dunlap* v. *Bellah* (1960) 184 Cal.App.2d 579, 585 [7 Cal. Rptr. 766]; *Moore* v. *Satir* (1949) 92 Cal.App.2d 809, 812 [207 P.2d 835]; *D. E. Sanford Co.* v. *Cory Glass etc. Co.* (1948) 85 Cal.App.2d 724, 730 [194 P.2d 127]; *Owens* v.

*Noble* (1946) 77 Cal.App.2d 209, 215 [175 P.2d 241]; *Carpenter* v. *Pacific States S. & L. Co.* (1937) 19 Cal.App.2d 263, 268 [64 P.2d 1102, 66 P.2d 656]; *Everhardy* v. *Union Finance Co.* (1931) 115 Cal.App. 460, 466 [1 P.2d 1024].)

█ Unless there is a lack of evidence to support the finding of the trier of fact, its determination of this issue will not be disturbed on appeal. (*Everhardy* v. *Union Finance Co., supra*; *Kinkle* v. *Fruit Growers Supply Co.* (1944) 63 Cal. App.2d 102, 112 [146 P.2d 8]; *Moore* v. *Satir, supra*; *Dunlap* v. *Bellah, supra*.)

█ In the instant case, the evidence pertinent to the events and transactions allegedly constituting the accord and satisfaction was in conflict. In the first place, as we have seen, Standard's witnesses maintained that it agreed to pay the invoice of July 26, 1962, only on condition it receive ''reassurance'' that it was the final payment on the building and exhibits and that such reassurance was given by Conderback in its letter of August 2, 1962 (see fn. 12, *ante*). On the other hand, Conderback's witness Railsback testified that he attended all of the meetings out of which the accord is supposed to have arisen and that there was no condition affixed to the payment of the invoice. Conderback also introduced testimony explaining how the letter of August 2 happened to be sent (see fn. 12, *ante*). According to Conderback's witnesses, Standard's Whitmore dictated the crucial opening sentence of the letter to Conderback's office manager giving no explanation that this understanding had been reached between the parties and thereafter van der Woert signed the letter on the assumption that it referred to the finality of the particular billing.[22] Standard's check did not indicate it was tendered in full and final payment.

A second and more significant consideration however is the fundamental issue raised by the parties as to the exact nature of their contractual arrangements. As we have set forth above, Standard's evidence was directed to establishing its central thesis that the work was being done on the basis of Conderback's firm bid of February 12, 1962, plus the costs of

[22]Conderback's invoice of July 26, 1962, set forth a column of 16 items, with amounts of billing for only six items, the columnar spaces opposite the others being left blank. The six items billed totalled $39,848.87. Attached to the invoice are detailed schedules covering the same 16 items with a series of columns headed ''Amount as of 7/16/62,'' ''Additional Requested,'' ''Total,'' ''Amount Paid,'' ''Amount Requested,'' ''Amount to be Billed.'' The invoiced amount of $39,838.87 appears as a footing in the columns ''Additional Requested'' and ''Amount Requested.''

any changes or additions thereafter occurring to be negotiated between the parties. Conderback's evidence, on the other hand, was directed to supporting its position that in accordance with the customary business methods employed by the parties over a long period of time, Standard had given Conderback for the Fair Exhibit what amounted to an "open-ended" purchase order to which Conderback's customary formula was to be applied in calculating the amount due. (See fns. 3, 17, *ante*.) Thus the divergent theories of case advanced by the evidence of the respective parties pervade and affect the subsidiary issue of accord and satisfaction. Conderback's evidence on the main issue of the case, to the effect that the firm bid of February 12, 1962, had been superseded by the many additions and changes and that Conderback was to be compensated under an open-ended purchase order by application of a pricing formula, establishes that all expenses were to be computed and billed from time to time and necessarily supports the inference that a billing for an "additional requested" amount was not a final billing for the project as a whole.

Events transpiring after the alleged accord and satisfaction of July and August 1962 fall into the same pattern of plaintiff's evidence. As to these, there was evidence that in September 1962 Standard made a further payment to Conderback; that in the same month the latter sent Standard a list of developments relating to unpaid accounts; that in December 1962 the parties had discussions in connection with additional bills, quite apart from the tax liability; and that Standard made a payment in February 1963.

From all of the foregoing evidence introduced by Conderback, the jury could reasonably conclude that the parties did not agree that the July 26 invoice was to be a final billing and that its payment by Standard was to constitute full payment for the building and exhibits, but could conclude that the various items of expense were to be billed from time to time until Conderback, in accordance with the parties' customary practices in the past, had been paid for all costs of the project.

The *Potter* and *Creighton* cases relied upon by defendant do not declare rules of law different from those set forth by us herein. They are distinguishable on their own facts from the case before us and hold that upon evidence which is neither in conflict nor reasonably susceptible of conflicting inferences the respective creditors therein knew or of neces-

sity must have known that payment was in full satisfaction of all amounts claimed to be due.

We turn to consider defendant's three claims of error in the admission of evidence.

1. At the first trial on the separate defenses Railsback testified on direct examination concerning discussions had with Mattes in the spring of 1963 about Conderback's most recent billing and the formula applicable to it. Railsback was then asked if Mattes approached him with a new formula of his own to which defendant's counsel interposed that "possibly we are getting into objectionable area" and "whether or not Standard offered to help these people out to a certain extent in April would be a matter which would be excluded from evidence" and "I don't think that they should get into any offers made by Standard." Plaintiff's counsel stated that "this isn't a settlement negotiation" and "We are not asking for offers." The court observed that in considering whether or not there was a settlement in July or August 1962, the jury could consider what transpired thereafter and overruled the objection. The witness thereupon testified as set forth in the footnote.[23] At the second trial the same evidence was admitted over defendant's objection that it was "an offer of settlement." Plaintiff's counsel stated "This isn't an offer of settlement. This is introduction now of a different formula after years of dealing." Standard now claims it was prejudiced before both juries.

The rule is well established that offers in compromise are not admissible in evidence as such. (*People* ex rel. *Dept. of Public Works* v. *Forster* (1962) 58 Cal.2d 257, 263 [23 Cal. Rptr. 582, 373 P.2d 630] and cases cited therein; Code Civ. Proc., § 2078; 4 Wigmore on Evidence (3d ed.) § 1061, p. 28; Witkin, Cal. Evidence (1958) p. 182; McCormick on Evidence, pp. 157-158, 539.)

As we think the trial judge properly held at the first trial, evidence of discussions between the parties in 1963 was relevant on the issue then before the jury (see fn. 1, *ante*) of whether there had been an accord and satisfaction between them in July or August 1962. (See *Owens* v. *Noble, supra,* 77

[23]Railsback testified: "In the meeting the day before they had offered us—this group of nine people, as I recall, had offered us a 17.625 markup on the over-all cost of the job. This amounted to, well, none on the over-all costs on some balance of it. It amounted to $7,000, which we refused. Mr. Mattes called the ensuing morning, called me personally and offered a different formula that amounted to $28,000, which I also refused."

Cal.App.2d 209, 215.) Plaintiff's counsel there stated that his purpose in introducing such evidence was not to elicit evidence of offers in compromise. At no time did defendant's counsel request an instruction to the jury limiting the purpose for which the evidence might be considered. (See *Hatfield* v. *Levy Brothers* (1941) 18 Cal.2d 798, 810 [117 P.2d 841]; *Daggett* v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 665-666 [313 P.2d 557].) In any event, the first trial was limited to the issues raised by the special defenses. In our view, the admission of the evidence at the first trial was not error.

The problem at the second trial is a more difficult one since, as we have said, plaintiff's theory of case was that it was to be compensated according to a pricing formula and in line with customary practices in the past. In our view, this theory did not justify the admission of what were apparently offers to compromise the then pending dispute and the admission of such evidence was error.

However, even assuming that the admission of the evidence at the first trial was error, neither such error nor the error at the second trial appears to us to be prejudicial in the light of the entire record. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

2. At the first trial evidence was admitted, over defendant's objection, to the effect that prior to 1960 plaintiff had lost money on several jobs it had done for Standard and that in some cases Standard paid plaintiff more money on being apprised of the loss. This evidence of a course of dealing in the past was offered to show the contractual arrangements in the instant matter and to negate the existence of a firm bid contract. Evidence of other similar contracts between the same parties establishing a custom, habit or continuing course of business dealing is admissible as showing that on a particular occasion the thing was done as usual. (*Roberts Distributing Co.* v. *Kaye-Halbert Corp.* (1954) 126 Cal.App.2d 664, 676 [272 P.2d 886]; 2 Wigmore, *op. cit.*, § 377, p. 307; McCormick, *op. cit.*, p. 347; 31A C.J.S., Evidence, § 180, pp. 457-458.) We cannot agree with Standard that this rule became inapplicable in the instant case because the Seattle project was much larger than previous jobs. The record indicates that in respect to the Seattle job Standard conducted its initial discussions and solicited estimates in line with projected budgeting in substantially the same manner as it had on previous occasions.

■ Defendant also argues, without citation of any cases, that even though the above evidence is deemed proper as showing a prior course of dealing, it was nevertheless inadmissible since it contradicted the express provisions of the "final" billings. Considering the billings as instruments of a contractual nature, nevertheless the evidence did not contradict but rather interpreted them by showing the true intent of the parties and giving the instruments a meaning to which they were reasonably susceptible. It was admissible for such purpose. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal. 2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] ; *Hulse* v. *Juillard Fancy Foods Co.* (1964) 61 Cal.2d 571, 573 [39 Cal. Rptr. 529, 394 P.2d 65] ; *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265] ; *Imbach* v. *Schultz* (1962) 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272] ; Code Civ. Proc., § 1860; Rest., Contracts, § 235(d).)

■ 3. At the first trial defendant's counsel read into evidence portions of the testimony of Railsback given at a deposition taken by defendant in which the witness was asked to explain alleged discrepancies in costs in various documents already before the jury. Railsback testified that he could not explain in detail without records but could explain "in generalities." In the course of this explanation he stated in the deposition that because of Conderback's need for funds, "we would take and let go, things we were negotiating at that moment . . . to get some money that would keep us going until next time. Having had past experience, long years of past experience with Standard I felt sure this would be adjusted fairly and squarely in the ultimate negotiations that followed jobs of this nature."

The deposition testimony then continued: "Q. [By defendant's counsel] And you say you prepared this thing and let go of certain sums, is that right? A. Yes, that is right."

Upon the request of plaintiff's counsel and the order of the court, defendant's counsel was then required, over his objection, to read the rest of the last answer as set forth in the footnote.[24]

Defendant contends that the admission of the rest of the

---

[24]Mr. Brown, defendant's counsel, then read the following complete answer: "Yes, that is right. Putting them off, may I say, putting off certain sums or certain portions of certain sums, hoping that and trusting that they would do as we had previously been on jobs of this nature. I said that this fell into four general areas."

answer was error since the witness' "secret intent" was conclusionary, not responsive and irrelevant. However, the objectionable portion of the answer had some bearing upon the testimony already read and plaintiff's counsel, upon re-direct examination or at any other appropriate time during plaintiff's case, would have been entitled to read such portion into evidence himself. (Code Civ. Proc., § 1854;[25] *Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846, 852 [3 Cal.Rptr. 459] and authorities there collected; Witkin, *op. cit.*, pp. 677-678; McCormick, *op. cit.*, p. 132; cf. *Zibbell* v. *Southern Pac. Co.* (1911) 160 Cal. 237, 250 [116 P. 513]; *Bacon* v. *Grosse* (1913) 165 Cal. 481, 490 [132 P. 1027].)

It was also within the sound discretion of the trial judge to require defendant's counsel to read all of the answer in order to obviate immediately any false or distorted impression the jury might receive from a fragmentary introduction. McCormick states the applicable rule in this situation as follows: "[T]he prevailing practice seems to permit the proponent to prove any relevant part that he desires. It seems, however, that to guard against the danger where it exists of an ineradicable false first impression, the adversary should be permitted to invoke the court's discretion to require the proponent to prove so much as relates to the fact sought to be proved, that is, all that is relevant to explain or is needed in interpreting the part proved." (McCormick, *op. cit.*, pp. 131-132.) The trial court did not abuse its discretion in the instant case. Furthermore, we cannot see how defendant could have possibly been prejudiced anyway since its counsel, just prior to the answer in dispute, had read into evidence similar testimony (quoted by us above) as to what Railsback "felt" would be done by Standard.

Standard further complains that the court's instructions to the first jury on accord and satisfaction compounded the claimed error since, while stating that accord and satisfaction depended on the mutual intention of the parties, it failed to state that such intention must be determined by the words and actions of the parties and that subjective motives must be disregarded. The point is without

---

[25]Code Civ. Proc., § 1854, provides: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence."

merit. An examination of the instructions referred to[26] satisfies us that they are correct statements of the law and that, contrary to defendant's claim, they *do* state that the intention of the parties "must be determined from all the circumstances, both *oral* and *written*" (italics added). We do not see how the jury could have been misled into believing that they were to consider also the secret intentions of Railsback.

Standard next contends that there is no evidence to support the verdict of $154,374.45 or any part thereof. The gist of the argument in support of this point seems to be this: that the so-called "firm" bid of February 26, 1962, constituted the contract between the parties and the jury by its verdict in effect disregarded the firm bid and re-evaluated the job on a time and materials basis. Standard seems content to confine its argument to these assertions and within this narrow range. Its responsibility in urging a total insufficiency of evidence extends much further. ■ "The appellate court starts with the presumption that the evidence sustains each finding of fact [citations], and the burden rests upon appellant 'to demonstrate that there is no substantial evidence to support the challenged findings.' [Citations.] To this end appellant must set forth in his brief all material evidence upon the point, not merely his own proofs [citations]; . . ." (*Davis* v. *Lucas* (1960) 180 Cal.App.2d 407, 409 [4 Cal.Rptr. 479].)

We have already alluded to the central issue raised by the parties as to the contractual arrangements entered into between them. This was spelled out in detail by the second pretrial conference order. It is apparent that at the second trial the jury found in favor of plaintiff's theory of case and rejected defendant's theory of case. ■ It follows therefore that in urging the insufficiency of the evidence defendant must do more than merely reassert its position at the trial.

■ We have carefully examined the record and the

***

[26]The instructions in question are: "You are instructed that question of the existence of an accord and satisfaction depends upon the intention of the parties, which must be determined from all the surrounding circumstances, both oral and written. There must be a meeting of the minds between the parties to an accord, whether there was an accord in this case, is a question for you as jurors to decide."

"For there to be a valid accord and satisfaction you must find that both parties knew and intended that a final settlement was taking place and that each knew and understood the terms of the settlement."

exhibits and we are satisfied that with the exceptions herein-after noted there is substantial evidence as set forth by us above to support a finding that the so-called firm bid did not constitute the contract between the parties but that their agreement must be found in a series of negotiations and arrangements interpreted in the light of their prior course of dealing. Supportive of the conclusion that the letter of February 26, 1962, did not constitute the contract between the parties is the following, among other, evidence in the record: that it arose out of an earlier letter of February 12, 1962, giving an estimate of the total cost of the job which Standard required only for budgetary reasons; that by this time Conderback had already been doing work on the job for seven months on the basis of a previous budget figure in accordance with the parties' prior course of dealing, as we have set forth *supra*; that the initial budget figure had already been exceeded; that the bid of February 26, 1962, was "based on designs and details as planned as of February 12, 1962"; that nevertheless after it was sent it was quickly ignored in respect to any changes in the project; that it was not "accepted" by Standard until March 23, approximately one month before the Fair opened, by which time most of the project had been completed and more than the $351,000 amount of the bid had either been paid by Standard to Conderback or already committed on the job; and finally that, as Whitmore testified, Standard was not about to stop Conderback's performance of the project if the February 26 letter had not been sent.

In its fifth contention on appeal Standard asserts that the inclusion in the judgment of amounts for maintenance[27] and a markup on the design fee is contrary to the undisputed evidence.

As to the first item, the record shows without contradiction that, as defendant claims, the maintenance of the project was under a *separate* contract and that Conderback had been paid in full for all such services. Standard points out to us that notwithstanding this clear testimony, an amount for maintenance of $40,412.91 as calculated according to the formula advanced by plaintiff was erroneously submitted to the jury. After deduction of the sum of

---

[27]Maintenance was a "24-hour round-the-clock service" at the Fair building by three of Conderback's employees throughout the course of the Fair. They would keep the building up, clean it, "work on things, be called at any time to repair, etcetera."

$31,769.60 admittedly paid in full for maintenance under the separate agreement, this would leave, according to Standard, an excessive amount of $8,641.31. Plaintiff has not questioned these figures either in its briefs or at oral argument but attempts to justify the amount on the basis that Standard did not permit Conderback to dismantle the project. The gist of this argument is that originally Conderback billed its maintenance at cost because it was going to do the dismantling work and, when it was not permitted to do so, it then recomputed the maintenance work using its formula. This point has no merit. Conderback's representative testified that Conderback had been paid for all maintenance services under a separate agreement. It cannot use an alleged breach to create additional maintenance charges in this matter. The inclusion of the sum of $8,641.31 was improper.

As to the design fee, Standard contends that the parties did not intend that Conderback should have a markup and that as a consequence an excessive amount of $6,609.37 is included in the judgment. We cannot agree. Although Standard points to initial correspondence in which no mention is made of a markup on the design fee, there was testimony that the markup was to be applied at the end of the job. This was a part of plaintiff's general theory of case, involving the prior course of dealing between the parties which the jury passed upon favorably to plaintiff.

Finally Standard contends that the court erred in awarding interest on the judgment from the date of filing the original complaint.[28]

Civil Code section 3287 provides in relevant part: ''Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, . . .'' Under this section interest cannot be awarded prior to judgment when the amount of damages cannot be ascertained except on conflicting evidence. (*Lineman* v. *Schmid* (1948) 32 Cal.2d 204, 212 [195 P.2d 408, 4 A.L.R.2d 1480]; *Coughlin* v. *Blair* (1953) 41 Cal.2d 587, 604 [262 P.2d 305].) The rationale of such rule is that where a defendant does not know what

---

[28]The judgment on the verdict provides for ''interest thereon at the rate of seven percent (7%) per annum from the date the obligation became due, being the date of the filing of the Complaint in this action, being May 13, 1963, . . .''

amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it. (*Cox* v. *McLaughlin* (1888) 76 Cal. 60, 70 [18 P. 100, 9 Am.St.Rep. 164] ; *Chase* v. *National Indemnity Co.* (1954) 129 Cal.App.2d 853, 865 [278 P.2d 68].) However, when the exact sum of the indebtedness is known or can be ascertained readily the reason suggested for the denial of the interest does not exist. (*Courteney* v. *Standard Box Co.* (1911) 16 Cal.App. 600, 615 [117 P. 778].) If the amount owing can be calculated and determined from statements rendered by the plaintiff to the defendant and those statements are found to be true and correct, it is a matter of mere calculation and prejudgment interest can be awarded. (*Anselmo* v. *Sebastiani* (1933) 219 Cal. 292, 301 [26 P.2d 1].) " 'A dispute as to the price agreed, or as to the amount of work done or its cost, will not prevent the allowance of interest. . . . Where the data necessary to determine the amount due are supplied to the debtor by an invoice or statement, he will be charged with interest for failure to pay.' " (*Anselmo* v. *Sebastiani, supra,* 219 Cal. 292, 301-302; *Ansco Const. Co.* v. *Ocean View Estates, Inc.* (1959) 169 Cal.App.2d 235, 239 [337 P.2d 146] and cases there collected.)

In the instant matter, at least according to plaintiff's theory of case which the jury accepted, there is no single contractual document in which the sum due or the means of calculating it are clearly provided for. Indeed, according to plaintiff's theory, compensation is predicated on an "open ended" purchase order involving application of a pricing formula and negotiations between the parties, all in accordance with a prior course of dealing. We detect an inherent complexity in the process. The applicable test then is whether the exact sum found to be due plaintiff was known to defendant in that it was certain or capable of being made certain by calculation. (See *Gray* v. *Bekins* (1921) 186 Cal. 389, 399 [199 P. 767] ; *Perry* v. *Magneson* (1929) 207 Cal. 617, 623 [279 P. 650].) Standard could not determine what was owing until it had received from plaintiff some statement with supporting data from which it could make the determination. Conderback argues that after it presented its final bill in March 1963 it submitted its invoices, shop records and books to Standard. We are not persuaded that defendant was able to ascertain the exact amount due from this data, since plaintiff, who was presumably familiar with both its own data and its own pricing formula, arrived at several different

results.[29] Indeed, as previously mentioned, Conderback's principals, apparently concluding that their previous efforts at billing had not achieved certitude, as late as the latter part of January 1963 undertook a complete reauditing of the entire project. In the course of the reaudit, a Conderback accountant made a miscalculation resulting in a figure $16,652.35 in excess of the amount subsequently admitted by Conderback as the true amount. It is noteworthy that in its original complaint Conderback prayed for general damages in the sum of $139,256.92; in its amended complaint in the sum of $171,026.80; in its bill of particulars in the same amount; and that finally at the trial in June 1964, it amended its prayer to the sum of $154,374.45, for which a verdict was returned. We do not believe that under all the circumstances it can be said that the exact sum due Conderback could have been readily ascertained by Standard. We conclude that the allowance of interest prior to judgment was improper.

The judgment is modified by deducting therefrom the sum of $8,641.31 and by eliminating therefrom interest on the judgment from the date of the commencement of the action to the date of entry of judgment on the verdict and as thus modified the judgment is affirmed. Plaintiff is to recover its costs on appeal.

Molinari, J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 22, 1966.

---

[29]When asked at the trial to explain these divergent results, Railsback testified: ''We were at the time, I believe, auditing or in the course of auditing the job as a whole, and *these figures would change, I would dare say if they were audited today, they would change again.*'' (Italics added.)

[Crim. No. 6259. Second Dist., Div. Two. Jan. 27, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. WARREN PAUL BEGHTEL, Defendant and Appellant.

C. Donald McBride and David P. Weaver, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter R. Jones, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—This case now comes before this court for the second time, having once been decided in *People* v. *Beghtel*, 164 Cal.App.2d 294 [330 P.2d 444], filed October 16, 1958. We denied a rehearing November 5, 1958, and our Supreme Court denied a hearing on December 10, 1958. Appellant's petition for a writ of certiorari to the United States Supreme Court was denied by that court on March 2, 1959. (*Beghtel* v. *California*, 359 U.S. 930 [79 S.Ct. 615, 3 L.Ed.2d 632].) Nevertheless, on July 1, 1965, we entered our order recalling the remittitur filed herein by reason of the dictate of *Douglas* v. *California*, 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811].

Counsel representing appellant on the instant appeal have performed their duties in an extremely conscientious and workmanlike fashion. However, by way of assignment of error they have been able to suggest only (1) insufficiency of the evidence to support the judgment, and (2) violation of the rule enunciated in *Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].

Our prior opinion herein fully sets forth the facts and our reasons for rejecting the claim of insufficiency of the evidence. Since no purpose would be served by their repetition, we adopt the prior opinion in full as constituting to the extent thereof the present opinion of this court.

We consider appellant's arguments regarding the applicability of the recent decision in *Griffin* as being equally unmeritorious. The augmented record on this point reports the following:

tunity was offered then, as was now, for an explanation. None was given. You have a very direct statement as far as the corpus delicti is concerned. Obviously a car was used to get that particular distance away; this defendant was driving the car, and where he is afforded the opportunity to explain, and he doesn't, even though it is not in the nature of an accusatory statement because obviously the officers don't know of the commission of the robbery. I would say we at least had tied it in to such an extent that the explanation would be called for. It would seem to me, your Honor, that under all the circumstances this defendant driving a car obviously in a getaway, he at least must face the burden of proof of making an explanation which he hasn't done. People submit. I will submit the matter as to Count I because of the fact there has been a plea as to the other defendant.